Wilson v. The Bank of Orleans, et al.

---

## WILSON v. THE BANK OF ORLEANS, et al.

1. The Bank of Orleans obtained a judgment against an accommodation indorser, and levied an execution upon his property. The drawer of the bill proposed to the bank to pay the judgment, by instalments of ten per cent. every sixty days. The bank consented and suspended the execution. The first instalment only was paid. Held, that the surety was not discharged by this agreement.

Error to the Chancery Court at Montgomery.

THE bill was filed by the plaintiff in error, and charges,

that he was the accommodation indorser of a bill of exchange for $5,194 10, drawn by Whitman & Hubbard, and discounted for their benefit by the Bank of Orleans. That the bill was protested for non-payment, and judgment obtained thereon against complainant, in the name of Nisbet, an officer of the Bank. That after judgment, and whilst execution was running against all the parties, it was agreed between the bank and Whitman, that the execution should be staid, and that Hubbard and Whitman should pay ten per cent. on the amount of the judgment every sixty days, until the whole was paid. That the executions were in fact staid, and some of the instalments paid. That the complainant did not know, or assent to the arrangement, and that the Bank knew he was a mere accommodation indorser. That the Bank is now about to coerce the money from him by execution, &c.

The Bank answer, and admit the judgment, &c.; that Hubbard & Whitman being utterly insolvent, applied to the Bank to pay the judgment, upon which execution was then levied on the property of complainant, by instalments; that the Bank agreed verbally to receive payment of the debt by instalments of ten per cent. every sixty days, but denies that there was any agreement to stay the execution, or give time, by relying upon the promise of Whitman, and believing it to be a hard case upon the complainant, the Bank did in fact stay the execution, without any agreement to that effect, and that the promise of Whitman to pay by instalments was merely verbal. That complainant was informed of, and consented to the arrangement. That one instalment only was paid which was credited.

Nesbit, the Cashier, answered to the same effect.

On the 1st May, 1838, the Cashier of the Bank, wrote the following letter to the agent in Montgomery.

BANK OF ORLEANS, *New Orleans*, 1 *May*, 1838.

Dear Sir—I understand that the property of the indorser on Whitman & Hubbard's bill, which was placed in the hands of an attorney for collection, by my request, is advertised for sale, on the seventh instant, to satisfy the judgment obtained in that suit, as Whitman has made arrangements for the settlement of the claim here, you will please instruct Mr.

Goldthwaite, the attorney, to stay the execution, and reserve to the Bank all the benefit derived from the judgment.

The testimony of Whitman was taken, who states, that after making the arrangement with the Bank of Orleans, he wrote to complainant informing him of it. That he received from the Cashier of the Bank the following letter, dated July 6th, 1838:

"Dear Sir—On the 30th April last, the board of directors of the Bank consented that the suit instituted for the recovery of the debt due by Whitman & Hubbard, should be suspended, on condition that ten *per cent.* of the amount should be paid every sixty days. As no payment has yet been made, I am compelled to inform you, that directions will be forwarded to Montgomery to prosecute the suit, unless payment be made in accordance with your promise."

This note Whitman forwarded to the complainant, informing him that he could not pay it. He adds, "I told you when last in this place, that if the first payment was made, I would be able to pay the balance. I regret as much as you can, that I have been unable to meet the payment, and that it should subject you to any inconvenience, as the amount could have been paid at such times as would have been easy for you, and me, and your property could have been saved.

In reply to this letter, he received from complainant a certificate of deposit of $500, in the Bank at Montgomery. He states there was no consideration for the agreement, and no note or new security executed, and further states, that complainant was indebted to him at the time he requested him to advance the $500 to pay the first instalment.

Other evidence was taken, which it is not necessary to set out.

The Chancellor, considering that the arrangement entered into between Whitman and the Bank was not binding on the Bank, for want of consideration, and that if it was, complainant knew, and assented to it, dismissed the bill.

From this decree this writ is prosecuted, and is now assigned as error.

T. WILLIAMS, for plaintiff in error, contended, that there was a sufficient consideration for the agreement entered into

between Whitman and the Bank. That the judgment was obtained in Montgomery in this State, and if the money had been made by a sale of property, the Bank would have been compelled to transport it to New Orleans, which, by the a-greement, was to be done by Whitman. This being without the consent of the surety, discharged him from his liability.

BELSER and ELMORE, contra. The agreement to wait until the debt could be paid, was without consideration, and therefore not binding on either. They cited, 2 Land. 323; 4 Id. 104; 15 Johns. 433; 12 Wheaton, 556; 3 J. J. M. 526; 4 Leigh, 622; 2 Cow. 139; 2 Bibb, 27; 12 Johns. 426; 2 Hall, 185; 2 Vermont, 536; 6 Ala. 482.

If a binding contract was made, it was assented to by the complainant, 3 Bibb, 467; 5 Ohio, 207; 5 Ala. 388; 6 Id. 718; 1 Mason, 339.

ORMOND, J.—The defence set up in discharge of the judgment, is one which has frequently been presented in this court of late years,—that the surety has been discharged by the act of the creditor, giving time to the principal debtor, without his consent. To the success of this defence, it is necessary to establish, that a valid, binding contract has been made between the creditor and the principal debtor, without the consent of the surety, by which the contract to which he was a party, has been altered; as, where the time of payment is prolonged. This discharges the surety, because it not only increases his risk, and compels him to guarantee the ability of his principal for an additional period of time, but it also deprives him of the right of requiring the creditor to sue during the time so given for payment, and also of the privilege of paying the debt himself, and proceeding at once against his principal. The foundation of all this doctrine, which, as has been frequently observed, savors not a little of subtlety and refinement, is, that by the contract made without his consent, the risk of the surety has been, or may be increased.

A contract, to discharge the surety, must be on sufficient consideration, for if the delay be actually given, if the prom-

ise to delay was without consideration, the surety is not discharged. [Brickwood v. Annis, 5 Taunton, 614; Agee v. Steel, at the present term.]

The law as above stated, is also applicable where the debt is reduced to judgment, and the creditor precludes himself by a contract with the principal debtor, from proceeding to realize the fruits of his judgment for a stipulated period. [Carpenter v. Devon, 6 Ala. 724.] With this brief statement of the law applicable to such cases, we proceed to the examination of the agreement in this case, relied on as a discharge of the surety.

The principal debtor it appears was insolvent, and a judgment had been obtained against the complainant, the surety, execution levied on his property, and advertised for sale. In this state of things, the Bank agreed to stay proceedings upon the execution, and to receive payment from the principal debtor, by instalments of ten per cent. every sixty days, until the debt was paid.

If by this arrangement, the Bank had released the property of the principal debtor from sale, there would be great reason in the argument urged, but this is clearly an indulgence to the surety, and not to the principal, and we are not aware that it has been held, that such a contract would relieve him from his obligation.

Again, if this were not so, the agreement is without consideration. It was a favor granted at the importunity of the principal debtor, for which he says himself, in his deposition, there was no consideration. It is now urged, that by the agreement, the money was to be paid in New Orleans, whilst in the ordinary course of things, the payment would be made in Montgomery, which, it is supposed, would be a beneficial arrangement for the bank, as it would be saved the expense and trouble of transporting the money. It does not appear very clearly, that the contract was express to this point, or that there was any distinct understanding upon the subject. No writing was entered into by the parties, and it is very improbable, if this was the inducement to the change of the contract, that it was not expressly understood. The parties to the contract, when they came to execute it, did not so understand it, for we find, that the first, and only instalment

was paid, not in New Orleans, but in Montgomery, to the Bank there, as the agent of the Bank of Orleans, and it does not appear that the latter objected to receiving it, on that account, but that in fact it was received.

But if such was the agreement, we are unable to perceive how that would vary the case. Specie in Montgomery, has the same actual value, as it has in New Orleans; whether it would be worth more to the Bank in New Orleans, than it would be at Montgomery, depends upon factitious circumstances. If the Bank wanted funds in Montgomery, or if from the course of trade, the exchange between these two places was in favor of Montgomery, it would clearly be the interest of the Bank to have it paid in Montgomery. How the fact is, we are unable to say, as the record furnishes no means for the solution of the question. Nor can it admit of doubt, from the entire record, that this matter did not enter into the consideration of the parties, when the indulgence was given.

If it were necessary, it would not be difficult to show, that the surety was apprized of the arrangement, soon after it was made, and assented to it. Whitman says he informed him of the arrangement by letter, as soon as it was made; and the letter of Whitman to him in July, affords internal evidence, that he had previously conversed with the surety about the arrangement, not to mention the admissions of the latter to the cashier of the Montgomery Bank. Nor would it require stringent proof to show the assent of the surety to an arrangement which released his property from execution, and afforded a hope of the payment of the debt by his principal.

It is however unnecessary to consider this question, for on the other points of the case it is clear there is no equity in the bill, and that the decree of the Chancellor must be affirmed.